

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MER:MFS
F.#2008R00662

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

October 20, 2008

By ECF

The Honorable Sterling Johnson, Jr.
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:   United States v. John Doe aka "Jamel Donald Levy"
            Criminal Docket No. 08-359 (SJ)

Dear Judge Johnson:

      This letter is submitted to set forth the potential conflicts of interest on the part of the defendant's attorney, Michael A. Sheinberg, Esq.  These potential conflicts arise from: (1) the possibility that Mr. Sheinberg might be a witness in connection with certain evidence that the government may introduce at trial; (2) Mr. Sheinberg's relationship with William Sewell, an unlicensed private investigator and potential government witness who may have improperly relayed the personal information of the victim in this case to the defendant; and (3) Mr. Sheinberg having represented government witness Faris Abdul-Matiyn, also known as "Stephen Jackson," in a previous unrelated New York state criminal matter.  We submit this letter in anticipation of the Curcio hearing the Court has scheduled on October 23, 2008 at 11:00 a.m. to explore these potential conflicts and, if appropriate, to secure a conflict waiver from the defendant and Mr. Abdul-Matiyn, or a substitution of counsel.

      At this time, the government does not believe any of these conflicts, while serious, constitute an "actual" conflict necessitating disqualification.  However, each has the immediate potential to ripen into an actual conflict.  We therefore advise the Court of these matters pursuant to our obligations under Second Circuit law so that the Court may conduct appropriate inquiries pursuant to United States v. Curcio, 680 F.2d 881, 888-90 (2d Cir. 1982).  See, e.g., United States v. Stantini, 85 F.3d 9, 13 (2d Cir. 1996); United States v. Malpiedi, 62 F.3d 465, 467 (2d Cir. 1995).

Honorable Sterling Johnson, Jr.
October 20, 2008
Page -2-

BACKGROUND

The Charges

On May 29, 2008, a Grand Jury sitting in the Eastern District of New York returned a five-count indictment against the defendant. These counts are as follows:

- Count One, Identity Theft, charges the defendant with violating Title 18, United States Code, Sections 1028(a)(7), 1028(b)(1)(A)(ii) and 3551 et seq. and alleges that, on or about and between February 6, 2002 and April 30, 2008, the defendant used and possessed a means of identification of another person with the intent to violate a federal law by making false statements in connection with a passport application.

- Count Two, False Statements in Application for Passport, charges the defendant with violating Title 18, United States Code, Sections 1542 and 3551 et seq., and alleges that on or about February 6, 2002, the defendant made false statements in an application for a passport.

- Count Three, Fraud and Misuse of Visas, Permits, and other Documents, charges the defendant with violating Title 18, United States Code, Sections 1546(a) and 3551 et seq. and alleges that on or about February 6, 2002 the defendant used documents prescribed by statute and regulation as evidence of authorized stay and employment in the United States, knowing such documents were illegally obtained.

- Count Four, Social Security Fraud, charges the defendant with violating Title 42, United States Code, Section 408(a)(6) and Title 18, United States Code, Section 3351, et seq. and alleges that on or about December 1, 2006 the defendant knowingly furnished false information to the Commissioner of Social Security by using another individual's social security number.

- Count Five, Aggravated Identity Theft, charges the defendant with violating Title 18, United States Code, Sections 1028(a)(1), 1028A(b), 1028A(c)(11) and 3351 et seq. and alleges that during and in relation to the crime charged in Count Four the defendant used the identification of another person.

The Court has yet to set a trial date for this matter.

Honorable Sterling Johnson, Jr.
October 20, 2008
Page -3-

## The Facts

The facts of this case are particularly convoluted, thus the government will only recount those pertinent to the conflict determination required of the Court.

### The Defendant, Abdul-Matiyn and the Offense Conduct

On February 6, 2002, the defendant submitted an application for a U.S. Passport (Form DSP-11) at the Breevoort U.S. Post Office in Brooklyn, New York. In his application, the defendant claimed to be Jamel Donald Levy, and to have been born on July 22, 1973 in the United States.

As proof of U.S. Citizenship, and in support of his application, the defendant presented a New York City Birth Certificate in the name of "Jamel Donald Levy" and a Social Security Card bearing the same name. The defendant also submitted an Affidavit of Identifying Witness executed by Faris Abdul-Matiyn, also known as "Stephen Jackson", a U.S. Citizen.[1] That affidavit stated that Mr. Matiyn was the defendant's biological father.

The defendant's DSP-11 was subsequently flagged for investigation by the Department of State Diplomatic Security Service ("DSS"). Subsequent investigation by DSS agents between May 2002 and June 2004 made it increasingly apparent that the defendant was not Jamel Donald Levy, and that the permanent address supplied by the defendant in connection with his DSP-11 was fraudulent.

On June 29, 2004, DSS agents questioned and fingerprinted the defendant. While FBI fingerprint records indicated no prior arrests for the defendant, a Jamel Donald Levy (the "True I.D.") had been arrested numerous times.[2] At this meeting, DSS agents also seized various identification documents in the defendant's possession bearing the name "Jamel Donald Levy," or permutations thereof.

---

[1] Faris Abdul-Matiyn's birth name is Stephen Jackson.

[2] The agents subsequently compared the defendant's fingerprint set to that of the True I.D. Needless to say, they did not match.

Honorable Sterling Johnson, Jr.
October 20, 2008
Page -4-

On July 25, 2006 DSS agents verified with the Social Security Administration ("SSA") that the Social Security Number ("SSN") used on the defendant's DSP-11 was that of the True I.D.

The December 6, 2006 Interview of the True I.D.

On December 6, 2006, DSS agents interviewed the True I.D. and obtained a written sworn statement and fingerprints from him. The True I.D. stated that, sometime during the Summer of 2006, he had been visited by an investigator named William Sewell, working on behalf of the defendant.[3] According to the True I.D., Mr. Sewell was reportedly looking to obtain more information about the True I.D. to better establish the identity of the defendant.

According to the True I.D., he and Mr. Sewell met on a number of occasions. At first, the True I.D. thought that Mr. Sewell was trying to help him, and thus disclosed all of his pedigree information to Mr. Sewell, including a copy of his driver's license and a photo of himself. Eventually, the True I.D. grew wary of Mr. Sewell, and their contacts ceased.

The January 3, 2007 Interview of the Defendant

On January 3, 2007, DSS agents again interviewed the defendant, this time in the law offices of Mr. Sheinberg, who remained present throughout the interview. Another attorney, Alice Charles, who claimed at the time to be representing the defendant was also present.[4]

During this interview, the defendant made various inculpatory statements. Among other things, the defendant claimed that his current residence was 382 Legion Street,

---

[3] Sewell was working with Mr. Sheinberg, who was apparently retained some time in late 2004 to assist the defendant with his Passport difficulties and then agreed to assist the defendant with his self-described identity difficulties.

[4] Ms. Charles was subsequently replaced by Mr. Sheinberg, who on May 21, 2007 informed the government that he had been retained to represent the defendant in this matter.

Brooklyn, New York,[5] that Mr. Abdul-Matiyn was his biological father and that he and Mr. Abdul-Matiyn had taken a paternity test to prove it.[6] The defendant also offered a convoluted and incredible explanation concerning his underlying claim to U.S. Citizenship and how he came to the United States.

Should the defendant testify or offer evidence or arguments at trial that are fairly rebutted by these or other statements made at the January 3, 2007 interview in Mr. Sheinberg's office, the government intends to offer evidence of those statements either through cross-examination or as rebuttal evidence. Attached is a copy of the portion of the Report of Investigation by DSS Special Agent Joe Ugarte detailing the defendant's statements. See Exhibit B.

The March 12, 2008 Interview of Abdul-Matiyn

On March 12, 2008, agents of the FBI, SSA, and DSS visited Mr. Abdul-Matiyn. Mr. Abdul-Matiyn, a U.S. Citizen, presented a valid U.S. Passport to confirm his identity. When shown a picture of the defendant, Mr. Abdul-Matiyn identified him as "Donald Levy." When asked what his relationship was to the defendant, Mr. Abdul-Matiyn stated that the defendant was his "Muslim brother." Mr. Abdul-Matiyn, however, emphasized that the defendant was not his biological son, nor any other biological relation.

The DSS Agent then showed Mr. Abdul-Matiyn the Affidavit of Identifying Witness submitted in connection with the defendant's DSP-11. Mr. Abdul-Matiyn verified his signature and stated that he had signed the affidavit and recalled giving it to the Post Office. Mr. Abdul-Matiyn also stated that he had "vouched for" the defendant for his U.S. Passport application. When the agents showed Mr. Abdul-Matiyn the relationship section 2 stating "parent" in the affidavit, Mr. Abdul-Matiyn stated that

---

[5] As with the addresses provided by the defendant in his various interviews, there is no record of his ever having lived at this address. This is the address of Mr. Abdul-Matiyn.

[6] The results of this alleged test were never produced to the government. Moreover, a subsequent 10/13/08 paternity test by DNA Diagnostics Center returned a 0% probability of paternity. A copy of these test results is attached. See Exhibit A.

he did not fill out the sections in the affidavit affirming his relationship and years of knowing the applicant.

Mr. Abdul-Matiyn further claimed that from 2005 to 2007, while he was in prison for a parole violation, he had asked the defendant to look after his personal affairs. According to Mr. Abdul-Matiyn, the defendant had instead taken money from Mr. Abdul-Matiyn. When Abdul-Matiyn confronted the defendant, the defendant claimed that he had used the funds to pay for Mr. Sheinberg for legal services in connection with the defendant's passport application difficulties.[7] Mr. Abdul-Matiyn then responded that Mr. Sheinberg had already been paid by the leaders of the Pitkin Avenue mosque who had set aside funds to assist the defendant. Mr. Abdul-Matiyn further stated that Mr. Sheinberg had refused to get involved in the dispute, and that the defendant later agreed to pay back the missing funds, which he failed to do.

The June 19, 2008 Interview of William Sewell

On June 19, 2008, DSS and SSA agents interviewed William Sewell, Jr., at Mr. Sheinberg's office. While Mr. Sheinberg consented to Mr. Sewell meeting the agents at his office, Mr. Sheinberg was not present for the interview, nor was anyone else. Among other things, Mr. Sewell, who is not a licensed private investigator, stated that he is paid to provide services for Mr. Sheinberg such as serving subpoenas.

During this interview, Mr. Sewell claimed that he first learned of the defendant in 2004 from Mr. Sheinberg who had represented the defendant's alleged father, Mr. Abdul-Matiyn, who was then incarcerated. Mr. Sheinberg described the defendant to Mr. Sewell as a client who was having identity problems, and that someone else was using the same SSN as the defendant. Mr. Sewell claimed that Mr. Sheinberg, and subsequently the defendant, told him that the defendant and Abdul-Matiyn were related.

Mr. Sewell stated that immediately prior to his first meeting with the defendant, he had been given a photocopy of the defendant's driver's license, and possibly a social security card, by Mr. Sheinberg. Mr. Sewell also stated that he had

---

[7] For example, Mr. Sheinberg made certain inquiries to the Passport office on the defendant's behalf. See, e.g., Exhibit C.

Honorable Sterling Johnson, Jr.
October 20, 2008
Page -7-

possibly served a medical subpoena for Mr. Sheinberg pertaining to Mr. Abdul-Matiyn. Mr. Sewell's second meeting with the defendant was at Mr. Sheinberg's office. It is unclear whether Mr. Sheinberg was present when Mr. Sewell met with the defendant on this occasion.

Mr. Sewell further claimed that in or about 2004-2005, Mr. Sheinberg went to Rikers Island to question Mr. Abdul-Matiyn about the defendant. According to Mr. Sewell, during this meeting, Mr. Abdul-Matiyn made various statements to Mr. Sheinberg concerning his relationship to the defendant. These statements are inconsistent with those Mr. Abdul-Matiyn made to the agents during the March 12, 2008 interview.

Mr. Sewell further alleged that the defendant then met with him and Mr. Sheinberg in Mr. Sheinberg's office in or about 2005. During this meeting the defendant made various inculpatory statements concerning how he got to France, his time there and how he came to the United States.

Mr. Sewell subsequently met the True I.D. at Rikers Island. Mr. Sewell claims he explained the "identity mix-up" to the True I.D. At this time, Mr. Sewell collected pedigree information from The True I.D. such as his date of birth, father's name, mother's name, sibling history and family contact details including his wife, Cherika Levy. Sewell then contacted The True I.D.'s mother who verified that her son, the True I.D., was in prison. Sewell also contacted Cherika Levy who then provided him a photocopy of the True I.D.'s New York State drivers license and New York State benefit card. According to Mr. Sewell, it was at this point he realized that the True I.D. was the real Jamel Donald Levy.

Regardless, Mr. Sewell later went with the defendant to the Brooklyn Social Security Office (SSA) to present them with his findings. Mr. Sewell claims that he did not give copies of any of the documents in his possession, including the photocopies of the True I.D.'s identification documents, to the defendant, but that he may have shown the defendant the True I.D.'s personal information. Mr. Sewell also provided the agents with information concerning a fee dispute between Mr. Sheinberg and Mr. Abdul-Matiyn concerning the defendant paying Mr. Sheinberg too much for his services.

Honorable Sterling Johnson, Jr.
October 20, 2008
Page -8-

## LEGAL ANALYSIS

Mr. Sheinberg's representation of the defendant presents multiple potential conflicts of interest, each of which has the immediate potential to ripen into an actual conflict of interest. The first of these stems from the possibility that Mr. Sheinberg might be a witness in connection with certain evidence that the government may introduce at trial. The second conflict of interest stems from Mr. Sheinberg's business relationship with William Sewell, an unlicensed private investigator and potential government witness who may have improperly relayed the personal information of the True I.D. to the defendant. The third and final potential conflict of interest stems from Mr. Sheinberg having represented government witness Faris Abdul-Matiyn in a previous unrelated New York state criminal matter.

An attorney has a potential conflict of interest "if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." See United States v. Kliti, 156 F.3d 150 n.3 (2d Cir. 1998) (citing Cuyler v. Sullivan, 446 U.S. 335, 356 n.3 (1980) (Marshall, J., concurring in part and dissenting in part)). By contrast, "[a]n attorney has an actual...conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal or issue or to a course of action." Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993) citing Cuyler, 446 U.S. at 356 n.3 (1980) (Marshall, J., concurring in part and dissenting in part))

As for the first potential conflict, when an attorney has first-hand knowledge of events presented, he acts as an unsworn witness. See United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993). When the defense attorney may act as an unsworn witness at trial, he can be disqualified even if the defendant signs a waiver because it is the prosecution, not the defense that is prejudiced. Id. at 934. As detailed above, Mr. Sheinberg's numerous contacts with the defendant, Mr. Sewell and Mr. Abdul-Matiyn from at least 2004 clearly indicate that he has first-hand knowledge of a number of the key facts in this case.

One example of this is Mr. Sheinberg's presence at the January 3, 2007 meeting between ths defendant, DSS agents and others at his office. Should Mr. Sheinberg's recollection of events differ from the agents' testimony regarding the defendant's statements, the defendant might wish to call Mr. Sheinberg as a witness to contradict the government's proof. In

Honorable Sterling Johnson, Jr.
October 20, 2008
Page -9-

<u>United States v. Kliti</u>, 156 F.3d 150 (2d Cir. 1998), the Second Circuit vacated a conviction and ordered a new trial where it became apparent during the trial that the defense attorney could have been called as a fact witness to support his client's defense, but was not permitted to testify and where no <u>Curcio</u> waiver had been secured from the defendant.  See <u>Kliti</u>, 156 F.3d at 155-57.

      As for the second potential conflict of interest, a conflict becomes unwaiveable if the defense attorney's self-interest conflict with his client's interests "so severely as to permeate every aspect of the representation."  See <u>United States v. Perez</u>, 325 F.3d 115, 124 (2d Cir. 2003).  Were Mr. Sewell to be called a government witness, Mr. Sheinberg's potential conflict of interest would ripen into an actual conflict of interest as Mr. Sewell's conduct and contacts with the defendant come under scrutiny.  At this point, Mr. Scheinberg's business relationship with Mr. Sewell, along with his interactions with Mr. Sewell, Mr. Abdul-Matiyn and the defendant would present an actual conflict of interest, since at this point "the attorney's and defendant's interests [would almost certainly] 'diverge with response to a material factual or legal issue or to a course of action.'"  <u>United States v. Malpiedi</u>, 62 F. 3d 465, 469 (2d Cir. 1995).

      For example, were it to serve the defendant's interest to implicate Mr. Sewell and potentially Mr. Sheinberg for introducing him to Mr. Sewell, then there is a clear and direct conflict.  It would further be against Mr. Sheinberg's interest to advise the defendant on this course of action.  Given the facts relayed above, there are various other readily imaginable scenarios whereby Mr. Sheinberg's interests might diverge from those of the defendant, such as any inquiry into Mr. Sewell's knowledge of the dispute between Mr. Abdul-Matiyn and the defendant concerning Mr. Sheinberg's fees.

      The third potential conflict of interest arises out of Mr. Sheinberg's representation of Mr. Abdul-Matiyn.  The government intends to call Mr. Abdul-Matiyn as a witness in its case in chief.  As describe above, Mr. Abdul-Matiyn made statements to Mr. Sheinberg in or about 2004-2005 that contradict his subsequent sworn statements to law enforcement personnel.  Moreover, Mr. Sheinberg's advice to the defendant might be influenced by his concern for how it might affect Mr. Abdul-Matiyn, a former client.

Honorable Sterling Johnson, Jr.
October 20, 2008
Page -10-

"In most cases when a defendant is faced with a situation in which his attorney has an actual or potential conflict of interest, it is possible for him to waive his right to conflict-free counsel in order to retain the attorney of his choice." United States v. Schwarz, 283 F.3d 76, 95 (2d Cir. 2002). See also United States v. Perez, 325 F.3d 115, 127 (2d Cir. 2003) ("lesser conflicts, such as an attorney's representation of two or more defendants or his prior representation of a trial witness, are generally waivable"). Waiver can extend to the situation where an attorney must cross-examine a former client in order to provide effective representation. See United States v. Oberoi, 331 F.3d 44, 50 (2d Cir. 2003). The former client may also sign a waiver. However, the court has discretion to reject both these waivers. Id. at 52. Finally, if the Court finds that a conflict exists, and that "the conflict is of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation...the attorney must be disqualified, regardless of whether the defendant is willing to waive his right to conflict-free counsel." Schwarz, 283 F.3d at 95-96.

Accordingly, we request that the Court explore with the defendant at this Thursday's hearing these potential conflicts of interest to determine whether the defendant would prefer to preserve his right to call his current attorney as a witness at trial (thus necessitating disqualification), or forgo his ability to call Mr. Sheinberg as a witness (and retain him as trial counsel). In this connection, the defendant should be afforded an opportunity to explore what, if any, testimony his attorney could offer on his behalf in response to the testimony of the agents, Mr. Abdul-Matiyn and Mr. Sewell. The Court could then determine whether the defendant is prepared knowingly and intelligently to waive his potential conflict of interest and, if so, whether to accept such a waiver. We note that the Court has already appointed independent counsel to advise the defendant with respect to these matters. See Curcio, 680 F.2d at 890.

Finally, should the Court entertain and accept a waiver of the potential conflicts of interest, we would ask that Mr. Sheinberg be directed to conduct any cross-examinations of the agents, Mr. Abdul-Matiyn and Mr. Sewell in such a way as to avoid becoming an unsworn witness at trial. See Kliti, 156 F.3d at 156 n.7; United States v. Jones, 900 F.2d 512, 520 (2d Cir. 1990).

Honorable Sterling Johnson, Jr.
October 20, 2008
Page -11-

## CONCLUSION

  For the foregoing reasons, the government respectfully requests that the Court inquire into the above described conflicts at this Thursday's <u>Curcio</u> hearing.

           Respectfully submitted,

           BENTON J. CAMPBELL
           United States Attorney

      By:    /S/
           Michael F. Stoer
           Assistant U.S. Attorney
           (718) 254-6452

cc: Michael A. Sheinberg, Esq.
   Deirdre Von Dornum, Esq
   Frank Handelman, Esq.